IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

KASEY LANDA,                      )
                                  )
          Plaintiff,              )
                                  )
     v.                           )  Case No.
                                  )  10-3140-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
          Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kasey Landa seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's applica-
tion for Child Insurance Benefits and Supplemental Security
Income under the Social Security Act ("the Act").  Plaintiff
argues that the ALJ erred in (1) discounting plaintiff's
testimony about her inability to work, (2) failing to consider
the effect of plaintiff's mental condition on her residual
functional capacity, and (3) relying on a hypothetical that did
not include plaintiff's mental impairment.  I find that the
substantial evidence in the record as a whole supports the ALJ's
finding that plaintiff is not disabled.  Therefore, plaintiff's
motion for summary judgment will be denied and the decision of
the Commissioner will be affirmed.

## I.   BACKGROUND

On June 27, 2007, plaintiff applied for disability benefits
alleging that she had been disabled since August 8, 2004.

Plaintiff's disability stems from anxiety and residual problems from a car accident. Plaintiff's application was denied on September 5, 2007. On August 18, 2009, a hearing was held before Administrative Law Judge Linda Carter. On October 19, 2009, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On February 26, 2010, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing.

## A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income:

| 2004 | $ 204.60 | Employed by Patti Holt, Inc. |
|------|----------|------------------------------|
|      | $ 204.60 |                              |

| 2005 | $ 202.24 | Employed by KFC |
|------|----------|-----------------|
|      | 284.50 | Employed by Communication Solutions |
|      | 315.53 | Employed by Ozark Restaurants |
|      | 645.59 | Employed by Mazzios Corporation |
|      | $1,447.86 | |

| 2006 | $ 23.12 | Employed by Limited Brands |
|------|---------|----------------------------|
|      | 47.58 | Employed by Incredible Pizza |
|      | 8.33 | Employed by Mazzios Corporation |
|      | $ 79.03 | |

| 2007 | $ 307.00 | Employed by Days Inn |
|------|----------|----------------------|
|      | $ 307.00 | |

| 2008 | $ 390.95 | Employed by Southwest Missouri Mgmt. |
|------|----------|--------------------------------------|
|      | $ 390.95 | |

(Tr. at 125-126, 131-133).

**Disability Report - Field Office**

On July 16, 2007, S. Lawhon, III, met face to face with plaintiff in connection with her disability claim (Tr. at 147-149). Mr. Lawhon observed that plaintiff had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 148).

**Disability Report**

In an undated disability report, plaintiff reported that she stopped working on November 1, 2006, because she moved (Tr. at 151). Her past employment included working as a pizza cooker from September 2005 to January 2006 and in October 2006, as a sales associate in a department store in November 2006, as a server in a fast food restaurant in July 2004 and July 2005, and as a telemarketer in September 2005 (Tr. at 152). Her longest job was as a pizza cooker where she put toppings on the crust, put the pizza into the oven, took the pizza out of the oven, and delivered it to the buffet line or servers (Tr. at 152). She worked four hours per day, standing and walking the entire time.

**Function Report**

In a Function Report dated July 30, 2007, plaintiff described her daily activities as follows:

> I go to class at OTC. Afterwards I come home, do things around the house that need to be done. If I have free time

I spent it with my friends maybe shopping or just hanging out then I return home.

(Tr. at 159). Plaintiff is able to prepare her own meals which takes about 30 minutes (Tr. at 161), she does "pretty much everything" as far as indoor and outdoor household chores, but "not anything hard." (Tr. at 161). It takes her "a few extra hours" to do these chores. Plaintiff reported she went out every day either driving or riding in a car (Tr. at 162). Plaintiff was able to go out alone and shop for clothes in stores (Tr. at 162). Plaintiff scrapbooks often (Tr. at 163).

Plaintiff indicated that her impairments have affected her ability to lift, squat, bend, stand, walk, kneel, climb stairs, and remember (Tr. at 164). Her impairments have not affected her ability to reach, sit, talk, hear, see, complete tasks, concentrate, understand, follow instructions, use her hands, or get along with others (Tr. at 164).

She reported that she could walk "prob[ably] not even a mile" and then she would need to "rest for about 5 mins. depending on how bad it hurts." She reported that she could pay attention for at least 30 to 45 minutes (Tr. at 164).

Plaintiff reported that she does not handle stress or changes in routine well, but she does not have any unusual behavior or fears (Tr. at 165).

**B.   *SUMMARY OF MEDICAL RECORDS***

On November 10, 2003, plaintiff saw Cheryl Williams, D.O., for a well woman check, and she asked for "something for depression." She reported crying and having problems at home. She was assessed with depression and was prescribed Prozac.

On January 8, 2004, plaintiff saw Dr. Williams for medication refills (Tr. at 335). She was assessed with depression.

Seven months later, on August 8, 2004, plaintiff was in a car accident. This is her alleged onset date. She was 16 years old at the time. Plaintiff was a patient at Cox Medical Center from August 9, 2004, through September 1, 2004 (Tr. at 196-315). Plaintiff was brought to the emergency room after having been found in a ravine several hours after she had been ejected from a vehicle in a car accident which left the other two occupants of the vehicle dead. One of the deceased was plaintiff's twin brother. Plaintiff suffered a burst fracture at T12 and L1, left transverse process fracture of L2, an open fracture of the left humerus, one hundred percent displaced left distal radius fracture, fracture of the left hip, fracture of her left wrist, left rib fractures, left femoral neck fracture, multiple abrasions and lacerations, and a closed head injury (Tr. at 198). Plaintiff tested positive for marijuana on arrival at the

emergency room and reported smoking cigarettes daily (Tr. at 229, 298).

On the day of admission, she underwent surgeries to repair an open left humeral fracture, left distal radius fracture, and left femoral neck fracture.  Two days later she underwent a bone graft of her open left humeral fracture.  She had a right chest tube inserted on August 13, 2004.  Plaintiff was in intensive care and on ventilator support for several days.  Her spine fracture was treated in a brace and "appeared stable." (Tr. at 197).  She had no neurologic dysfunction.  She was very confused for several days but Daniel Cardwell, M.D., believed that may have been from her sedative medications.  Once those were minimized, her mentation "did clear some."  On September 1, 2004, she was transferred to rehab for further treatment.  At the time of her discharge, plaintiff's x-rays revealed that all fractures were satisfactorily aligned, her closed head injury was starting to resolve, and her radial nerve palsy was starting to resolve as well (Tr. at 199).

On September 17, 2004, plaintiff saw Dr. Olive for a follow up (Tr. at 322).  Plaintiff's wounds were healing well.  "The patient can start ambulating, weightbearing as tolerated on her lower extremities.  I think this will further stimulate her hip fracture to heal, it can tolerate her weight at this time and, in

fact, that will be good to promote the fracture healing in the hip."

On October 15, 2004, plaintiff saw Dr. Olive, who noted that plaintiff's burst fracture had healed, and her left wrist fracture had healed (Tr. at 321-322). "The patient is doing very well. She is walking now with no hip pain. She is off her antibiotics. She really has no complaints. She is at home now. All her incisions are well healed. There is no sign of infection. Her radial nerve is now working in the left hand. . . . This patient is doing very well. She will continue her walking program. She is now full weightbearing with no pain."

On November 30, 2004, plaintiff saw Dr. Olive for a follow up (Tr. at 321). "She is doing very well. She notes some stiffness and soreness in her back and arms with the weather but, overall, she is doing well. She has no specific complaints today. . . . The patient's physical examination is unremarkable. She has a good range of motion in her upper extremity and hip." Plaintiff's wrist fracture was healing well, the T12 fracture was "healed well" and her left hip fracture was "healed well." Plaintiff was released from Dr. Olive's care.

On May 9, 2005, plaintiff saw Dr. Williams for congestion and coughing (Tr. at 332). Plaintiff complained of depression, "gets very upset very easily, twin killed in MVA, patient

seriously injured, has therapist." Plaintiff was tearful and unable to console herself. She was assessed with upper respiratory infection and grief. She was given a prescription for Lexapro [treats depression and anxiety] and medications for her upper respiratory infection.

On June 2, 2005, plaintiff saw Dr. Williams and complained of pain in her left hip (Tr. at 331). She was assessed with depression.

On August 4, 2005, plaintiff was seen at Mt. Vernon Family Health Care complaining of anxiety (Tr. at 342). "She often cries and does feel depressed although most of her problems are because of anxiety and stress. She feels like she is at her breaking point but denies wanting to hurt herself. She would feel much better if she can get her anxiety down to a manageable level. . . . She sleeps well at night. She has tried Prozac in the past with no help. She does see a psychologist[1] once a month. She has thought about suicide in the past but does not having [sic] a plan and does not want to go through with it." Plaintiff denied using drugs, alcohol, or tobacco. Plaintiff was assessed with anxiety disorder with depression and was given a prescription for Klonopin [treats panic disorder].

---

[1]There are no monthly psychology records in the transcript before me.

On October 5, 2005, plaintiff saw Dr. Williams and complained of depression (Tr. at 330). She reported having problems with her mom, but things were OK at school. She asked for Effexor. Dr. Williams assessed depression and prescribed Effexor XR.[2]

On October 6, 2005, plaintiff saw Dr. Williams for a well-woman check (Tr. at 329). She was assessed with asthma and was prescribed Advair and Singular.

On December 12, 2005, plaintiff saw Dr. Williams (Tr. at 328). Plaintiff complained of anxiety and requested a prescription for Valium[3] or Klonopin[4] and said she had stopped taking Effexor XR. Plaintiff was assessed with anxiety. The prescription is illegible.

On September 20, 2006, plaintiff was seen at Mt. Vernon Family Health Care complaining of left hip pain (Tr. at 340-341). "Standing for long hours seems to make the pain worse." She also had some pain in her mid and low back. Plaintiff had mild tenderness around L4-L5, minimal paraspinous muscle tenderness bilaterally, mild tenderness with palpation of the hip joint, and fairly significant pain with internal and external rotation of

---

[2]Treats depression, anxiety, and panic disorder.

[3]Treats anxiety, alcohol withdrawal, and seizures.

[4]Treats panic disorders and seizures.

the left hip.  The doctor ordered x-rays of her left hip and told her to take 600 mg of Ibuprofen twice a day on a regular basis.

On September 28, 2006, plaintiff saw Paul Olive, M.D., who had performed her orthopedic surgeries following her car accident (Tr. at 320).  Plaintiff said she had been experiencing left hip pain for the past month and a half.  On exam, Dr. Olive found that plaintiff had full internal rotation of the left hip with no pain.  She had some tenderness over the incision, some mild tenderness over the iliac crest, mild limitation of motion of the hip with flexion and external rotation but no significant pain associated with that.  X-rays revealed that the fracture was healed, the lag screw was well aligned, the femoral head was well maintained, screws and side plate were well aligned and completely covered with bone.  "I am not exactly sure of the etiology of her pain.  I recommended a bone scan.  The patient declined.  She really does not think there is much that can be done about it.  She would like to have some pain medicine.  She requested methadone[5] but I refused to give her this.  I will give her one prescription of Percocet 5/325.[6]  She states she will cut these in half.  I told her I do not want her taking these every day and I am not going to continue refilling this on a regular

_____

[5]Used to treat severe pain and to prevent withdrawal symptoms in people addicted to other drugs.

[6]Acetaminophen (Tylenol) and hydrocodone (narcotic).

basis and she understands.  She does not want any other treatment
at this time."

On May 8, 2007, plaintiff was seen at Mt. Vernon Family
Health Care for low back and left hip pain (Tr. at 338-339, 365).
Plaintiff's low back pain started about two months earlier.  "She
has been taking a friend's Methadone to relieve the pain.  The
pain in her hip and back is worse with standing or walking for
long periods of time."  Plaintiff was pleasant and in no acute
distress.  Examination of the left hip and back showed
significant tenderness with palpation of the left hip joint,
significant pain with internal rotation of the left hip and
abduction.  No pain with external rotation or adduction.
Plaintiff had significant pain around T10-T12 as well as L5-S1.
The doctor told plaintiff to stop using Methadone and prescribed
Norco[7] and Ibuprofen.

On May 29, 2007, plaintiff was seen at Mt. Vernon Family
Health Care for a follow up on medication (Tr. at 337, 364).
"Her pain is better although she has problems with activity as
well as at night.  Her pain level has been as high as 6/10
without radiation.  No weakness or numbness.  She is complaining
of anxiety.  She denies any depression.  She drinks alcohol
occasionally.  She smokes one pack every other day. . . .  The

---

[7]Acetaminophen (Tylenol) and hydrocodone (narcotic).

patient is pleasant and in no acute distress. . . . Examination of her back shows tenderness along the paraspinous muscles of the mid back. Minimal spinous tenderness in the lower thoracic spine and lumbar spine diffusely. She has 5/5 strength". Plaintiff was assessed with low back pain and was told to continue taking Norco for breakthrough pain. She was prescribed Naproxen (non-steroidal anti-inflammatory) and Flexeril (muscle relaxer). She was also assessed with anxiety and was prescribed Klonopin.

Plaintiff completed her application for disability benefits on June 27, 2007.

On August 30, 2007, Alan Aram, Psy.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment due to anxiety-related disorders was not severe (Tr. at 344). He found that she had no restriction in activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation (Tr. at 352). In support of his findings, Dr. Aram noted the following: "[L]eaves home daily, can go alone, shops, can mng $, hobbies, soc at class and church and hang out with friends, no problems getting along with others, can pay atten 30-45 minutes at least {is in college} not bad with written or spoken directions, OK with authority, never fired, not well with stress or changes.  - completed own form."

He noted that plaintiff had had no counseling, no drug or alcohol addiction, she stopped working because she moved and could only work part time, and her anxiety and depression appear to be controlled with medications. "Cl[aimant's] allegations are mainly physical".

On November 6, 2007, plaintiff returned to see Dr. Olive, her orthopaedic surgeon, complaining of left groin pain with weightbearing and walking (Tr. at 361). She was assessed with avascular necrosis (bone death due to insufficient blood supply to the area). Dr. Olive told plaintiff to use ibuprofen and he referred her to a hip specialist.

Eight months later, on July 10, 2008, plaintiff had a total hip replacement, performed at Shriners Hospital by John Clohisy, M.D. (Tr. at 370-381). She was discharged after four days in the hospital. At that time she was on crutches and was given prescriptions for Lortab[8] and Coumadin (blood thinner). She was given a prescription for physical therapy.

On August 14, 2008, plaintiff saw Dr. Clohisy at Shriners Hospital for a follow up on her left hip replacement (Tr. at 369). "She is doing well. She is four weeks out. She has lateral hip pain, otherwise had been putting full weight on it." Plaintiff was observed to ambulate with a slight limp. X-rays

---

[8]Acetaminophen (Tylenol) and hydrocodone (narcotic).

showed no problems.  She was told to return in three months.

Eight months later, on April 9, 2009, plaintiff saw Richard

Duey, M.D., at Shriners Hospital (Tr. at 367-368).

> Today she is doing well in regards to her hip.  She has no
> hip pain and no subjective leg length inequality.  She . . .
> walks free of any limp and does not require any assistive
> devices.  Her hip does not limit her in terms of how far she
> can walk.  She is able to go up and down stairs normally.
> She can only sit for about half an hour at a time in a chair
> due to a fracture of her tailbone.  Her limitation in
> sitting is not due to any problems with her hip.  This is
> due to her low back pain and not due to any hip problems.
> She is able to put on her shoes and socks easily.  Her only
> complaint today is low back pain, and she has had this since
> her accident. . . .  Her back bothers her if she stands or
> walks for long periods.  Her back pain does improve with
> rest.  She is not taking any medications for it at this
> time.  She has no night pain.  It does limit her activities
> somewhat.

> Examination:  Kasey walks with a normal heel-toe gait, and
> she has no Trendelenburg sign.[9]  Her leg lengths are equal,
> and her skin incision is well healed. . . .

> Plan:  Kasey was seen by Dr. Clohisy.  He is very pleased
> with how she is doing.  Physical Therapy also saw her and
> they reviewed some strengthening exercises for her
> abductors.  Dr. Clohisy would like to see her on an annual
> basis unless she begins to have a problem with her hip.

On August 5, 2009, plaintiff was seen by Lawrence Dybedock,

M.D., complaining that she could not sleep on a hard bed due to

hip pain (Tr. at 362-363).  "She is planning on spending 10 days

in jail and is concerned about the possible conditions that may

make her low back and left hip worse.  Increased activity and

---

[9]A Trendelenburg's sign is a gait adopted by someone with an
absent or weakened hip abductor mechanism.

17

laying on firm areas makes the pain worse.  Rest and pain medications help with the pain which is described as a sharp pain with a severity of 6/10."  Dr. Dybedock performed an exam and found that plaintiff's gait and station were normal with adequate muscle strength and tone, she had normal range of motion in her neck, back, and extremities.  He assessed left hip pain "as comment only – I typed a letter describing my concerns and recommendations in case she is incarcerated.  I will also start her on Naproxen [non-steroidal anti-inflammatory] daily with Vicodin[10] for prn [as needed] pain."

## C.    *SUMMARY OF TESTIMONY*

During the August 18, 2009, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

## 1.    Plaintiff's testimony.

Plaintiff was 21 years of age at the time of the administrative hearing (Tr. at 27).  She was 5'5" tall and weighed 131 pounds (Tr. at 28).

On August 8, 2004, plaintiff was in a car accident (Tr. at 32).  She was 16 years old (Tr. at 32).  She broke her left wrist, left arm, left hip, tail bone, her pelvic bones in three places, and her back (Tr. at 32).  She has a rod connecting her

---

[10]Acetaminophen (Tylenol) and hydrocodone (narcotic).

left shoulder to her left elbow (Tr. at 32).  She had two pins in her left wrist to make sure it healed properly, but they have been taken out (Tr. at 33).  She had hardware put in her left hip, but she developed severe arthritis which required a hip replacement on July 10, 2008 (Tr. at 33).

Plaintiff's lower back bothers her a lot now (Tr. at 34). When asked to describe the problems she has with her lower back, plaintiff said, "I can't stand for too long and then the weather makes it really ache and, I don't know, lifting objects, and, I don't know." (Tr. at 34).  Her attorney asked her if she had trouble sitting, and she said, "yes." (Tr. at 35).  Plaintiff's left hip still causes pain, and she can only lift about ten pounds with her left arm which causes her problems "on occasion" (Tr. at 35).

Plaintiff had a driver's license at one time but it was suspended due to too many points on her license (Tr. at 29).  If she has to go somewhere, she asks her mother or her grandmother to take her (Tr. at 29).  Since plaintiff's alleged onset date, she worked part time at a pizza place for two months in 2005 (Tr. at 30, 36).  Plaintiff worked as a waitress for a short time after her accident, and she worked at KFC for a brief time (Tr. at 36).  She left those jobs because it was too difficult to be on her feet the entire time (Tr. at 36).  Plaintiff has only had

one job where she sat most of the day (Tr. at 37). She worked as a telemarketer and was not allowed to stand up while she was working (Tr. at 37). At the time of the hearing, she was not working and had not applied any place for the past year (Tr. at 30). Plaintiff went to college for one semester in the fall of 2006, but then "put that on pause." (Tr. at 47). Her classes were spread apart and walking from one to another was difficult (Tr. at 50). She was planning to take classes on the computer so she could do it from home, but she never got around to it (Tr. at 50).

Plaintiff was supposed to spend ten days in jail but got a note from her doctor saying she could not lie on the hard beds due to her hip and back (Tr. at 47-48). She was arrested for driving while revoked (Tr. at 48).

Plaintiff's medication (Hydrocodone) causes drowsiness but not other side effects (Tr. at 30, 31). When she told her doctor about that, he asked her if she wanted to be put on another medication (Tr. at 31). She told him she did that the medicine did not make her too drowsy (Tr. at 31). Plaintiff also takes Klonopin for anxiety (Tr. at 40). "Every once in a blue moon" plaintiff has an anxiety attack (Tr. at 41). Plaintiff's pain causes problems with concentration; she can focus on a television program for about 20 to 30 minutes (Tr. at 41).

Plaintiff had a hip replacement, but is now full weight bearing and uses no assistive device (Tr. at 28). She believes she can sit for a maximum of 20 to 30 minutes at a time (Tr. at 38). Then she needs to move around or recline to alleviate the pain (Tr. at 38). She can stand for a maximum of 10 to 15 minutes (Tr. at 38). She cannot walk more than a block at a time (Tr. at 38). She can lift only ten pounds (Tr. at 38). If she had to lift many times, she could only lift about five pounds (Tr. at 38-39).

Plaintiff testified that she needs to recline for 30 to 45 minutes three or four times each day (Tr. at 39-40). She later testified that she needs to recline for an hour at a time (Tr. at 40).

On a typical day, plaintiff will hang around the house, do "odd and end chores," relax, and watch television (Tr. at 42). She helps with dishes "here and there," and helps her grandmother when she asks or needs help (Tr. at 42). She might help clean the windows (Tr. at 42). She can do dishes for 15 to 20 minutes; she can clean windows for about ten minutes (Tr. at 42). She can help prepare salads (Tr. at 42-43). Plaintiff can now jog but cannot run fast (Tr. at 43).

At the time of the hearing, plaintiff had not seen her doctor very much (Tr. at 45). She had not been working and was

able to get her pain medication, so she did not need to see a doctor (Tr. at 45-46).

**2.    Vocational expert testimony.**

Vocational expert George Horne testified at the request of the Administrative Law Judge.  Plaintiff has no past relevant work (Tr. at 51).

The first hypothetical involved a person 19 to 21 with a high school education and no past relevant work who can do no more than sedentary work, i.e., lifting and carrying up to ten pounds occasionally and five pounds frequently; can stand or walk for two hours per day and sit for eight hours per day with regular breaks; must avoid climbing or exposure to significant unprotected heights, dangerous or unguarded moving machinery, or commercial driving; must work on an even surface and in an air conditioned environment; cannot push or pull with the left foot; must have simple repetitive job instructions with up to three steps; and could not do customer service although proximity to the public or incidental contact with the public would be OK (Tr. at 52-53).

The vocational expert testified that such a person could work as a final assembler, D.O.T. 713.687-018, with 1,000 jobs in Missouri and 40,000 in the nation, or she could be a table worker, D.O.T. 739.687-182, with 800 in Missouri and 39,000 in

the country (Tr. at 53).

The second hypothetical was the same as the first except the person needed to alternate sitting and standing at 30 minute intervals and could stand or walk for no more than 30 minutes at a time (Tr. at 54). The vocational expert testified that, based on his experience, such a restriction would not change his response to the first hypothetical (Tr. at 54).

The third hypothetical was as follows:

> [A]ssume a, essentially the third hypothetical all of the restrictions in the first hypothetical with the ability to alternate sitting and standing at will throughout the day, that would then, even though not moving away from the work station would affect the ability to adhere to any required pace or production requirements?

(Tr. at 55). The vocational expert answered, "That's correct" (Tr. at 55). He explained that a sit-stand option at 30-minute intervals is tolerated, but a need to change positions any more frequently would interfere with the person's productivity, persistence, and pace (Tr. at 57).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Linda Carter entered her opinion on October 19, 2009 (Tr. at 12-20). The ALJ found that plaintiff had not attained the age of 22 as of her alleged onset date of August 1, 2004 (Tr. at 14).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).

23

Step two.  Plaintiff suffers from the following severe impairments:  History of motor vehicle accident with multiple trauma, primarily orthopedic and affecting the left side of the upper and lower body, including fracture to the left femoral neck, repaired with hardware, with development of degenerative joint disease of the left hip, and avascular necrosis or osteonecrosis of the femoral neck; now status post total left hip replacement in July 2008; degenerative disk disease of the lumbar spine; scoliosis; and history of compression fracture at T12 (Tr. at 14-15).  Plaintiff does not have a severe mental impairment (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff retains the residual functional capacity to lift or carry up to five pounds frequently and ten pounds occasionally, sit for 30 minutes at a time and for up to eight hours per day; stand or walk for 30 minutes at a time and for a total of two hours per day; cannot climb or be exposed to significant, unprotected heights or potentially dangerous or unguarded moving machinery; cannot do commercial driving; requires an even surface upon which to stand and walk; must avoid extremes of cold and humidity; cannot push or pull with the left lower extremity; cannot use foot controls with the left lower

extremity; requires simple, repetitive job instructions with up to three steps; and should not do customer service (Tr. at 15-16). Plaintiff has no past relevant work (Tr. at 18).

Step five. With this residual functional capacity plaintiff can perform the job of final assembler, with 1,000 jobs in Missouri and 30,000 to 40,000 jobs in the country, or she could be a table worker with 800 jobs in Missouri or 39,000 in the country (Tr. at 19). Therefore, plaintiff is not disabled (Tr. at 19).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988); <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. <u>Gray v. Apfel</u>, 192 F.3d 799, 803 (8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v.

<u>Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ
explicitly discredits testimony and gives legally sufficient
reasons for doing so, the court will defer to the ALJ's judgment
unless it is not supported by substantial evidence on the record
as a whole.  <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit
plaintiff's subjective complaints is supported by substantial
evidence.  Subjective complaints may not be evaluated solely on
the basis of objective medical evidence or personal observations
by the ALJ.  In determining credibility, consideration must be
given to all relevant factors, including plaintiff's prior work
record and observations by third parties and treating and
examining physicians relating to such matters as plaintiff's
daily activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,
effectiveness, and side effects of medication; and functional
restrictions.  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir.
1984).  Social Security Ruling 96-7p encompasses the same factors
as those enumerated in the <u>Polaski</u> opinion, and additionally
states that the following factors should be considered:
Treatment, other than medication, the individual receives or has
received for relief of pain or other symptoms; and any measures
other than treatment the individual uses or has used to relieve

pain or other symptoms (e.g., lying flat on his or her back,
standing for 15 to 20 minutes every hour, or sleeping on a
board).

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> The claimant protectively filed her applications on June 27,
> 2007, reporting a history of motor vehicle accident with
> injuries and hip pain.  She underwent total left hip
> replacement in July 2008, with full weight-hearing noted
> four weeks later.  No restrictions were imposed by her
> treating physicians.  The record includes no medical source
> statements limiting her functioning in any way.  In April
> 2009, it was noted that the claimant was doing well with a
> normal physical examination.  There was no evidence of
> residuals from the claimant's closed head injury.

> The claimant has not yet established a work history; her
> past, part-time work at telemarketing did not allow position
> change. The claimant stated that pain medications helped;
> the record includes no conspicuous evidence of side effects.
> Reference to side effects was not apparent among the primary
> care provider's office notes.  Anxiety disorder was
> diagnosed in 2007, but not currently, and was treated by the
> claimant's primary care provider.  The claimant has seen her
> primary care provider mainly for medication refills.  The
> claimant's activities of daily living include helping her
> grandmother with housework and meal preparation.

(Tr at 16-17).

## 1.   *PRIOR WORK RECORD*

Plaintiff has almost no work history.  She has never
attempted a job which is mostly sitting and with a sit-stand
option.  In her Disability Report, plaintiff said she stopped
working because she moved which conflicts with her testimony that

she stopped working because it was too difficult to stand all day.

## 2. DAILY ACTIVITIES

Plaintiff reported on July 30, 2007, that she goes to college, she does things around the house that need to be done, she goes shopping and hangs out with her friends, she prepares her own meals, does "pretty much everything" as far as indoor and outdoor household chores except not anything hard, she goes out driving or riding in cars on a regular basis, she shops for clothes, and she scrapbooks often. This is inconsistent with her testimony that she reclines for four hours a day, relaxes, watches television, and helps with odds-and-ends jobs for about ten minutes at a time.

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

On October 15, 2004, after plaintiff's accident, her treating orthopedic surgeon noted that "she really has no complaints."

Less than four months after her accident, plaintiff saw her orthopedic surgeon who wrote, "She is doing very well. She notes some stiffness and soreness in her back and arms with the weather but, overall, she is doing well. She has no specific complaints today." Plaintiff's exam on that day was unremarkable and she was released from Dr. Olive's care. Plaintiff did not see

another doctor for the next six months, indicating that her symptoms were not that bad.

Plaintiff saw Dr. Williams, her primary care doctor, on December 12, 2005, and got a prescription for anxiety. She did not see another doctor for the next nine months, and even then did not complain of anxiety or depression, indicating that her symptoms were adequately controlled.

In September 2006, plaintiff reported left hip pain (this was before her hip replacement). On exam she had only mild tenderness in her lumbar spine and minimal muscle tenderness. The following week, plaintiff saw her orthopedic surgeon who wrote, "I am not exactly sure of the etiology of her pain." He recommended a bone scan, but plaintiff declined, instead asking for methadone. Dr. Olive refused to prescribe methadone, but gave her "one prescription" of Percocet and told her he would not refill it. "She does not want any other treatment at this time." Plaintiff went the next eight months without seeing a doctor and apparently without any medications since Dr. Olive had refused to give her refills of Percocet.

Plaintiff saw a doctor in May 2007, and then went six months without any medical treatment, indicating that her symptoms were not that bad. At that time, she saw her orthopedic surgeon and complained of hip pain. She was told to take ibuprofen. There

are no medical records for the next eight months until plaintiff
had a hip replacement.

A month after her hip surgery, she was "doing well."  She
was told to return in three months, but she did not return for a
follow up until eight months later, indicating that her symptoms
were well controlled.  When she had a follow up in April 2009,
her doctor noted that her hip did not limit her in walking,
climbing stairs, or sitting.  He reported that plaintiff said her
back hurts if she stands or walks for long periods or if she sits
for more than half an hour at a time; however, he specifically
stated that this was "not due to any hip problems."  Notably,
plaintiff was taking no pain medication at that time.

Plaintiff did not return to any doctor until she was faced
with jail time and requested an excuse due to an anticipated hard
bed.

## 4.   *PRECIPITATING AND AGGRAVATING FACTORS*

On September 20, 2006, plaintiff told her doctor that
standing for "long hours" aggravated her left hip pain.  This was
before she had a hip replacement.  On May 8, 2007, she said
standing or walking "for long periods of time" aggravated her hip
and back pain.  Again, this was before the hip replacement.
Further, the ALJ found that plaintiff could only stand or walk

for 30 minutes at a time and for a total of two hours per day, which is not "long periods of time."

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Plaintiff testified that she did not go to the doctor often because she was able to get her medications. In fact, there are many long periods of time when plaintiff had no medical care which indicates her medication was working well to control her symptoms. An impairment is not considered disabling if it is adequately controlled with medication. Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010); Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009).

Plaintiff went six months without seeing a doctor from November 2004 to May 2005. Plaintiff was not on medication during that time. She began taking medication for anxiety in 2005, but stopped taking the medication that her doctor had prescribed for her. During the nine months between December 2005 and September 2006, plaintiff saw no doctor, indicating that her new anxiety medication was working well. In September 2006 plaintiff reported hip pain and was told to take ibuprofen. Plaintiff was given one prescription of Percocet in late September 2006 with no refills, but went the next eight months without seeing a doctor. From May 2007 to November 2007 -- a six-month period -- plaintiff saw no doctor. During the November

2007 visit, she was told to take ibuprofen, and went the next eight months without medical care.

After her hip replacement, plaintiff was told to return in three months but did not go for a follow up until eight months later.  At that follow up, she was given physical therapy exercises to do, but was not given medication.  Plaintiff had no medical treatment over the next four months, and even then her motivation for going to the doctor was to get a note excusing her from serving jail time.

During the hearing, plaintiff testified that her medication causes drowsiness, but then she said she told her doctor that the medicine did not make her "too drowsy" and she did not need to change medicines.  Plaintiff testified she has no other side effects, and there is no evidence of side effects in the medical records.

## 6.   *FUNCTIONAL RESTRICTIONS*

A employee from Disability Determinations observed in a face-to-face meeting that plaintiff had no difficulty with understanding, coherency, concentrating, sitting, standing, or walking.  In a Function Report dated July 30, 2007, plaintiff reported that her impairments had **not** affected her ability to sit, complete tasks, understand, concentrate, follow instructions, or get along with others.

Plaintiff's orthopedic surgeon noted that plaintiff was doing very well and that she experienced some stiffness and soreness with the weather, but no other problems. In April 2009, plaintiff had no hip pain, she was able to walk free of any limp, did not require an assistive device, her hip did not limit her in terms of how far she could walk, she was able to go up and down stairs normally, she could put on her shoes and socks easily.

No doctor has ever limited plaintiff's activities. A lack of significant restrictions imposed by treating physicians supports a finding that a claimant can do some kind of work. Young v. Apfel 221 F.3d 1065, 1069 (8th Cir. 2000).

During the hearing, plaintiff was asked how her back pain limits her, and she testified that she cannot stand for too long, the weather makes it ache, and lifting objects aggravates it. She did not mention any difficulty sitting until her attorney suggested that.

Plaintiff testified that she needs to recline to alleviate pain; however, she never reported this to any doctor, no doctor ever suggested she recline to relieve pain, and this "need" conflicts with the daily activities as reported by plaintiff in her disability paperwork.

**B.    CREDIBILITY CONCLUSION**

At Mt. Vernon Family Health Care plaintiff reported no use of tobacco or illegal drugs, even though she previously had tested positive for marijuana and had reported smoking cigarettes daily.

Plaintiff has exhibited what appears to be drug-seeking behavior, although her doctors have not come right out and said that.  After nine months with no medical care, plaintiff complained of hip pain and asked for methadone.  She refused any other treatment.  After that, she went eight more months with no medical care, indicating that her pain was not that bad.  The ALJ may properly consider both the claimant's willingness to submit to treatment and the type of medication prescribed in order to determine the sincerity of the claimant's allegations of pain. Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999).

On her next doctor visit, plaintiff indicated she had been taking a friend's methadone.  She was told to stop doing that. In May 2007, plaintiff reported drinking alcohol, even though she was only 19 years old.

Plaintiff argues that the ALJ disregarded her testimony regarding her inability to pursue substantial gainful activity "even though she had attempted to do so after her motor vehicle accident.  That claimant had attempted and was unsuccessful in

being able to perform substantial gainful employment is not an opinion, but a reality." See plaintiff's brief, page 5.  The fact that plaintiff attempted to work at jobs that required walking and standing all day does not support her position.  Plaintiff testified that she had never attempted to work a job that involved mostly sitting with a sit-stand option.  A claimant cannot attempt jobs that are outside the residual functional capacity as found by the ALJ and use that as proof that he or she cannot perform any job in the national economy.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit plaintiff's subjective complaints of disabling symptoms.

## VII. MENTAL IMPAIRMENT

Plaintiff next argues that the ALJ erred in finding that plaintiff's mental impairment had no more than mild to no limitations on her daily activities, social functioning, concentration, persistence and pace.  "[E]ven though taking psychotrophic [sic] medication for this impairment and claimants [sic] testimony that she suffered from anxiety, as well as, panic attacks, the ALJ found that claimants [sic] mental impairments had no more than mild to no limitations".  See plaintiff's brief, page 7.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

(1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)  Capacities for seeing, hearing, and speaking;

(3)  Understanding, carrying out, and remembering simple instructions;

(4)  Use of judgment;

(5)  Responding appropriately to supervision, co-workers and usual work situations; and

(6)  Dealing with changes in a routine work setting.

There is no evidence that plaintiff's mental impairment is a severe impairment.  In a Function Report dated July 30, 2007 (when plaintiff was 19) she reported going to college classes,

doing things around the house that need to be done, and hanging out or shopping with her friends. She would go out every other day either driving or riding in a car, could shop for clothes by herself, and did scrapbooking. These are typical daily activities of someone her age. Plaintiff reported that her impairments had **not** affected her ability to complete tasks, concentrate, understand, follow instructions, or get along with others (Tr. at 164). She said she does not handle stress or changes in routine well, but that she did not have any unusual behavior or fears.

In May 2007, plaintiff denied having depression. In August 2007, Dr. Aram found that plaintiff's anxiety-related disorder was not severe, basing that opinion on the fact that plaintiff leaves home daily, can go out alone, shops, can manage money, has hobbies, is social at class and church and hangs out with friends, has no problem getting along with others, can pay attention for 30 to 45 minutes at least (since she was in college),[11] she was fine with written and spoken directions, had no problems with authority, had never been fired, and completed her own forms. Plaintiff testified that "every once in a blue moon" she has an anxiety attack. There is no evidence that

---

[11]Plaintiff testified that her trouble with college was walking from class to class. She did not testify that her mental impairment interfered with her ability to perform well in college.

plaintiff's mental condition was ever treated by any medical provider other than her primary care physician; she was prescribed antidepressants, but there is no evidence that she ever saw a mental health expert or participated in counseling. By plaintiff's own testimony, her medication controlled her symptoms, and that is why she rarely went to the doctor.

Plaintiff sought treatment for anxiety by her primary care physician from May 2005 until December 2005. She did not report any mental or psychological difficulties again until May 2007. She did not report any symptoms between December 2005 and May 2007, nor did she report any after May 2007.

The ALJ accounted for plaintiff's mental condition by finding that plaintiff requires a job with simple, repetitive job instructions (up to three steps) and should not do customer service. Although plaintiff argues that the ALJ erred in failing to evaluate the extent of plaintiff's mental impairment on her physical impairments, this is not the case. The ALJ acknowledged her duty to consider plaintiff's impairments in combination and accounted for plaintiff's mild mental limitations by restricting her to simple, repetitive job instructions with no customer service.

## VIII. HYPOTHETICAL QUESTION

Finally, plaintiff argues that the ALJ erred in relying on the vocational expert's testimony in response to a hypothetical that did not include "the inevitable effects of an anxiety disorder with panic attacks." The appropriateness of the RFC as determined by the ALJ with respect to plaintiff's mental impairment has already been discussed above.

A hypothetical question posed to a vocational expert must include all credible impairments and limitations. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). A hypothetical relied on by the ALJ need not include impairments the ALJ has found not credible. Id.; Stormo v. Barnhart, 377 F.3d 801, 808-809 (8th Cir. 2004). Because the hypothetical relied on by the ALJ included all of plaintiff's credible impairments, plaintiff's motion for summary judgment on this basis will be denied.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to find plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 15, 2011